# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellant,*

AMERICAN CIVIL LIBERTIES
UNION OF NORTHERN CALIFORNIA
INC; THE NATIONAL ASSOCIATION OF
CRIMINAL DEFENSE LAWYERS; AND
CALIFORNIA ATTORNEYS FOR
CRIMINAL JUSTICE,
        *Intervenors,*

        v.

HOSSEIN AFSHARI, aka Hosseini
Deklami; MOHAMMAD OMIDVAR;
HASSAN REZAIE; ROYA RAHMANI,
aka Sister Tahmineh; NAVID TAJ,
aka Najaf Eshkoftegi; MUSTAFA
AHMADY; ALIREZA MOHAMAD
MORADI,
        *Defendants-Appellees.*

No. 02-50355

D.C. No.
CR-01-00209-RMT

OPINION

Appeal from the United States District Court
for the Central District of California
Robert M. Takasugi, District Judge, Presiding

Argued and Submitted
September 9, 2003—Pasadena, California

Filed October 20, 2005

Before: Andrew J. Kleinfeld, Kim McLane Wardlaw, and
William A. Fletcher, Circuit Judges.

Opinion by Judge Kleinfeld

14393

## COUNSEL

Douglas N. Letter, U. S. Department of Justice, Washington, D.C., for the appellant.

Stephen P. Berzon, Altshuler, Berzon, Nussbaum, Rubin & Demain, San Francisco, California, for the appellees.

## OPINION

KLEINFELD, Circuit Judge:

We review the constitutionality of a statute prohibiting financial support to organizations designated as "terrorist."

### Facts

The issue here is the constitutionality of the crime charged in the indictment, that from 1997 to 2001, Rahmani and others knowingly and willfully conspired to provide material support to the Mujahedin-e Khalq ("MEK"),[1] a designated terrorist organization, in violation of 18 U.S.C. § 2339B(a)(1).[2]

According to the indictment, the defendants solicited chari-table contributions at the Los Angeles International Airport for the "Committee for Human Rights," gave money and credit cards to the MEK, and wired money from the "Com-

---

[1]The MEK is also known as the People's Mojahedin Organization for Iran, or PMOI, and has a variety of other aliases.

[2]In 1997, the Secretary of State designated the MEK as a foreign terror-ist organization under 8 U.S.C. § 1189.

mittee for Human Rights" to an MEK bank account in Turkey. They did all this after participating in a conference call with an MEK leader, in which they learned that the State Department had designated the MEK as a foreign terrorist organization. The MEK leader told them to continue to provide material support despite the designation. According to the indictment in this case, the money they sent to the MEK amounted to at least several hundred thousand dollars.

The MEK was founded in the 1960's as an Iranian Marxist group seeking to overthrow the regime then ruling Iran. It participated in various terrorist activities against the Iranian regime and against the United States, including the taking of American embassy personnel as hostages in 1979. After the Iranian regime fell and was replaced by a clerical, rather than a Marxist, regime, MEK members fled to France. They later settled in Iraq, along the Iranian border. There they carried out terrorist activities with the support of Saddam Hussein's regime,[3] as well as, if the indictment is correct, the money that the defendants sent them.

The MEK, since first being designated a terrorist organization, has developed a convoluted litigation history in the United States Court of Appeals for the District of Columbia. Because this history is important to the outcome of this case, we will briefly review the relevant parts.

The MEK was first designated a terrorist organization in 1997. The D.C. Circuit upheld this designation because the MEK was a "foreign entity without . . . presence in this country" and thus "ha[d] no constitutional rights under the due process clause."[4] Therefore, the MEK was not entitled to notice and a hearing. It also found the administrative record

---

[3]The 1997-2001 period of the conspiracy charged in the indictment was during Saddam Hussein's regime.

[4]*People's Mojahedin Org. of Iran v. Dep't of State*, 182 F.3d 17, 22 (D.C. Cir. 1999).

sufficient to establish that the MEK "engages in terrorist activity."[5] In the process of designating MEK a terrorist organization in 1999, the State Department determined that another organization, the National Council of Resistance of Iran, was an "alias" of the MEK.[6] When reviewing the 1999 designation, the D.C. Circuit held that the second organization had a presence in the United States and, based on that presence, that both organizations were entitled to "the opportunity to be heard at a meaningful time and in a meaningful manner."[7]

The D.C. Circuit remanded the 1999 designation to the State Department with the instructions that both organizations be given an opportunity "to file evidence in support of their allegations that they are not terrorist organizations."[8] Instead, the MEK submitted evidence showing that it was responsible for numerous assassinations of Iranian officials and mortar attacks on Iranian government installations.[9] Upon reviewing this redesignation, the D.C. Circuit noted that any procedural due process error that might have existed was harmless because the MEK had "effectively admitted" that it was a terrorist organization.[10]

For purposes of reviewing a motion to dismiss an indictment, we assume the truth of what the indictment alleges.[11] Thus, we take it as true that the defendants knew that they were furnishing assistance to a designated "terrorist" organization, having been informed of the designation in a conference call with an MEK leader.

---

[5]*Id.* at 24-25.

[6]*Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 197 (D.C. Cir. 2001).

[7]*Id.* at 208.

[8]*Id.*

[9]*People's Mojahedin Org. of Iran v. Dep't of State*, 327 F.3d 1238, 1243 (D.C. Cir. 2003).

[10]*Id.*

[11]*United States v. Jensen*, 93 F.3d 667, 669 (9th Cir. 1996).

The district court dismissed the indictment on the ground that the terrorist designation statute[12] was unconstitutional. We review de novo,[13] and reverse.

## Analysis

### I. Challenging the designation.

8 U.S.C. § 1189(a)(1) sets out a carefully articulated scheme for designating foreign terrorist organizations. To make the designation, the Secretary has to make specific findings that "the organization is a foreign organization"; that "the organization engages in terrorist activity (as defined in 8 U.S.C. § 1182(a)(3)(B))"; and that "the terrorist activity of the organization threatens the security of United States nationals or the national security of the United States."[14]

---

[12]8 U.S.C. § 1189.

[13]*United States v. Barrera-Moreno*, 951 F.2d 1089, 1091 (9th Cir. 1991).

[14]8 U.S.C. § 1182(a)(3)(B)(iii). Terrorist activity defined. As used in this Act, the term "terrorist activity" means any activity which is unlawful under the laws of the place where it is committed . . . and which involves any of the following:

(I) The highjacking or sabotage of any conveyance . . .

(II) The seizing or detaining, and threatening to kill, injure, or continue to detain, another individual in order to compel a third person . . . to do or abstain from doing any act as an explicit or implicit condition for the release of the individual seized or detained.

(III) A violent attack upon an internationally protected person . . . or upon the liberty of such a person.

(IV) An assassination.

(V) The use of any —

(a) biological agent, chemical agent, or nuclear weapon or device, or

(b) explosive or firearm . . . ,

The Secretary of State's designation is only the beginning. The Secretary also must furnish the congressional leadership advance notification of the designation and the factual basis for it, which Congress can reject.[15] The designation is published in the Federal Register.[16] The designated organization is entitled to judicial review of the Secretary's action in the United States Court of Appeals for the District of Columbia.[17] That court is directed to set aside the designation for the ordinary administrative law reasons, such as that the designation is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[18] That court must also set aside a designation for several other reasons, including that the designation is "contrary to constitutional right, power, privilege, or immunity."[19] Congress or the Secretary can revoke a designation.[20] Among the concrete incentives that a designated organization has to contest the designation is that the Secretary of the Treasury may require American financial institutions to block all financial transactions involving its assets.[21]

**[1]** The district court found that it was a facially unconstitutional restriction on judicial review of the designation for Congress to assign such review exclusively to the D.C. Circuit. We reject that position.

---

with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property.

(VI) A threat, attempt, or conspiracy to do any of the foregoing.

22 U.S.C. § 2656f(d)(2). [T]he term "terrorism" means premeditated, politically motivated violence perpetrated against noncombatant targets by subnational groups or clandestine agents.

[15]8 U.S.C. § 1189(a)(2)(A)(i).

[16]*Id.* § 1189(a)(2)(A)(ii).

[17]*Id.* § 1189(c)(1).

[18]*Id.* § 1189(c)(3)(A).

[19]*Id.* § 1189(c)(3)(B).

[20]*Id.* § 1189(a)(5), (6).

[21]*Id.* § 1189(a)(2)(C).

**[2]** Many administrative determinations are reviewable only by petition to the correct circuit court, bypassing the district court, and that procedure has generally been accepted.[22] Many are reviewable only in the D.C. Circuit, or the Federal Circuit, and those restrictions have also been generally accepted.[23] The congressional restriction does not interfere with the opportunity for judicial review, as the MEK's extensive litigation history shows. And this scheme avoids the awkwardness of criminalizing material support for a designated organization in some circuits but not others, as varying decisions in the different regional circuits might.

**[3]** However, a holding that a restriction of judicial review of the Secretary of State's designation of a terrorist organization to the Court of Appeals for the D.C. Circuit is not facially unconstitutional does not settle the question whether a defendant may be criminally prosecuted for donating to a designated organization. A defendant prosecuted in district court for donating to such an organization may bring a due process challenge to his or her prosecution in the district court. The district court properly ruled that it had jurisdiction to review this challenge. But its conclusion that § 1189 is facially unconstitutional, because judicial review of the terrorist designation was assigned exclusively to the D.C. Circuit, was in error.

II.   Due Process claim.

The statute assigns criminal penalties to one who "knowingly provides material support or resources to a foreign ter-

---

[22]*See, e.g.*, *City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320, 336 (1958); *Lockerty v. Phillips*, 319 U.S. 182 (1943) (holding that a district court lacked jurisdiction to hear a challenge to price controls under the Emergency Price Controls Act where Congress had vested judicial review for such challenges in an Emergency Court of Appeals).

[23]*See, e.g.*, 47 U.S.C. § 402(b) (vesting exclusive jurisdiction in the D.C. Circuit over appeals from certain decisions and orders of the Federal Communications Commission).

rorist organization, or attempts or conspires to do so."[24] The statutory phrase "terrorist organization" is a term of art, defined by Congress as "an organization designated as a terrorist organization" under 8 U.S.C. § 1189(a)(1).[25] The defendants' central argument is that § 2339B denies them their constitutional rights because it prohibits them from collaterally attacking the designation of a foreign terrorist organization. This contention was recently rejected by the Fourth Circuit en banc.[26] We, too, reject it.

**[4]** The specific section that is at issue here is 8 U.S.C. § 1189(a)(8), which states in relevant part:

> If a designation . . . has become effective . . . a defendant in a criminal action or an alien in a removal proceeding shall not be permitted to raise any question concerning the validity of the issuance of such designation or redesignation as a defense or an objection at any trial or hearing.

The defendants are right that § 1189(a)(8) prevents them from contending, in defense of the charges against them under 18 U.S.C. § 2339B, that the designated terrorist organization is not really terrorist at all. No doubt Congress was well aware that some might claim that "one man's terrorist is another man's freedom fighter." Congress clearly chose to delegate

---

[24]18 U.S.C. § 2339B. Providing material support or resources to designated foreign terrorist organizations

(a) Prohibited activities—

(1) Unlawful conduct—Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life.

[25]18 U.S.C. § 2339(B)(g)(6).

[26]*United States v. Hammoud*, 381 F.3d 316 (4th Cir. 2004) (en banc).

policymaking authority to the President and Department of State with respect to designation of terrorist organizations, and to keep such policymaking authority out of the hands of United States Attorneys and juries. Under § 2339B, if defendants provide material support for an organization that has been designated a terrorist organization under § 1189, they commit the crime, and it does not matter whether the designation is correct or not.

**[5]** The question then is whether due process prohibits a prosecution under § 2339B when the court vested with the power to review and set aside the predicate designation determines that the designation was obtained in an unconstitutional or otherwise erroneous manner, but nevertheless declines to set it aside. In reviewing MEK's 1999 designation, the D.C. Circuit found that "the designation does violate the due process rights of the petitioners under the Fifth Amendment" because the designation process did not afford MEK notice or an opportunity to be heard.[27] The D.C. Circuit did not vacate the designation, citing foreign policy and national security concerns as well as the fact that the designation would be expiring shortly.[28] Instead it left the designation in place and remanded to the Secretary of State with instructions that MEK be afforded due process rights.[29]

Defendants argue that the D.C. Circuit's failure to vacate the 1999 designation after finding a due process violation is incompatible with § 1189's "shall . . . set aside" language, and thus that the statute prohibits using the designation as a valid predicate for a subsequent prosecution. But we do not have authority to reverse the decisions of a sister circuit. Nor do we have the authority to review the State Department's designa-

---

[27]*Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 196, 200 (D.C. Cir. 2001).

[28]*Id.* at 209.

[29]*Id.*

tion because the statute confers that jurisdiction exclusively in the D.C. Circuit.

**[6]** Nor, although the plain language of § 1189(c)(3) appears to be mandatory, is the D.C. Circuit's approach inconsistent with precedent in analogous situations. Section 1189(c)(3) is nearly identical to § 706 of the Administrative Procedure Act, and the remedy the D.C. Circuit used here—remand without vacatur—has been used several times under the APA.[30] Though not entirely uncontroversial, remand without vacatur has long been supported by Supreme Court precedent,[31] had been utilized before the enactment of § 1189 in 1996, and was well-established when Congress modified elements of § 1189 in 2001 and 2004 without altering the judicial review procedure. Thus, despite the seemingly mandatory language in the statute, we believe § 1189(c)(3) can reasonably be read as the D.C. Circuit read it, to allow the remand of a designation without vacating it. This is especially so in this case, because the designation would have been unobjectionable if, as it initially appeared, the MEK was located entirely abroad and had no American location, and was, in any event, harmless because the MEK proudly proclaimed its own terrorist activities. Moreover, we will not lightly contradict in a collateral proceeding such as this a co-equal court's well established interpretation of a statute. Defendants' statutory argument therefore fails.

Defendants further claim that the Due Process Clause prevents a designation found to be unconstitutional from serving as a predicate for the charge of providing material support to a designated terrorist organization, even if the designation has never been set aside.[32] There are several reasons why this argument lacks force.

---

[30]*See*, *e.g.*, *Idaho Farm Bureau Federation v. Babbitt*, 58 F.3d 1392, 1405-06 (9th Cir. 1995).

[31]*See*, *e.g.*, *Hecht Co. v. Bowles*, 321 U.S. 321, 329-30 (1943).

[32]It bears noting that we are not addressing the constitutionality of a statute lacking in judicial review. To the contrary, § 1189 explicitly provides for judicial review, and the designation at issue in this case withstood judicial review when the D.C. Circuit let the MEK's 1999 designation stand.

First, the Supreme Court in *Lewis v. United States* held that a prior conviction could properly be used as a predicate for a subsequent conviction for a felon in possession of a firearm, even though it had been obtained in violation of the Sixth Amendment right to counsel.[33] The Court held that it was proper to prohibit a collateral attack on the predicate during the criminal hearing because the felon-in-possession statute made no exception "for a person whose outstanding felony conviction ultimately might turn out to be invalid for any reason."[34] The Court noted that the prohibition on collateral attack was proper because a convicted felon could challenge the validity of the conviction before he purchased his firearm.[35]

**[7]** The defendants attempt to distinguish *Lewis* from this § 2339B prosecution because the defendant in *Lewis* had the ability to challenge his predicate, whereas here the defendants themselves are prohibited from challenging the designation. But this does not change the principle that a criminal proceeding may go forward, even if the predicate was in some way unconstitutional, so long as a sufficient opportunity for judicial review of the predicate exists. Here there was such an opportunity, which the MEK took advantage of each time it was designated a foreign terrorist organization.[36]

**[8]** Second, the D.C. Circuit declined to set aside the 1999 designation. It remanded the determination but carefully explained that it did not vacate the designation.[37] After the remand, the D.C. Circuit upheld the redesignation; therefore,

---

[33]*Lewis v. United States*, 445 U.S. 55 (1980).

[34]*Id.* at 62.

[35]*Id.* at 64.

[36]*See People's Mojahedin Org. of Iran v. Dep't of State*, 182 F.3d 17 (D.C. Cir. 1999); *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192 (D.C. Cir. 2001); *People's Mojahedin Org. of Iran v. Dep't of State*, 327 F.3d 1238 (D.C. Cir. 2003).

[37]*Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 209 (D.C. Cir. 2001).

at all relevant times, the "foreign terrorist organization" designation had been in full force. This court and the D.C. Circuit are co-equal courts. We cannot reverse its decision.[38] Additionally, the statute expressly provides that only the D.C. Circuit may review these designations,[39] so it would be contrary to the statutory scheme for us to hold that the designation was invalid. We have already determined that any constitutional challenge against 8 U.S.C. § 1189 "must be raised in an appeal from a decision to designate a particular organization" and must be heard in the D.C. Circuit.[40]

[9] Third, 18 U.S.C. § 2339B only requires that Rahmani, et al., had knowledge of the MEK's designation as a foreign terrorist organization. The Fourth Circuit, sitting en banc, held that a criminal defendant charged under this statute cannot bring a challenge to the validity of a designation of an organization as "terrorist." In a case where there was no indication that the designation was invalid (other than the defendant's would-be challenge), the Fourth Circuit wrote, "[T]he *fact* of an organization's designation as an [terrorist organization] is an element of § 2339B, but the *validity* of the designation is not."[41] Here, the MEK has been designated a terrorist organization throughout the relevant period, and that designation has never been set aside. According to the indictment, defendants had knowledge of this designation, they were told during a telephone conference call with an MEK leader in October 1997 that the MEK had been designated a foreign terrorist organization by the State Department.

---

[38]*See Lowenschuss v. West Publishing Co.*, 542 F.2d 180,183 (3rd Cir. 1976) (ruling on an "official opinion of a court of another circuit . . . is undesirable on policy grounds alone").

[39]8 U.S.C. § 1189(c); *See also Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1137 (9th Cir. 2000) (the statute "provides for judicial review of the Secretary's decision in the" D.C. Circuit).

[40]*Humanitarian Law Project*, 205 F.3d at 1137.

[41]*United States v. Hammoud*, 381 F.3d 316, 331 (4th Cir. 2004) (en banc) (emphasis in original), rev'd on other grounds, 125 S.Ct. 1051 (2005), reinstated in part, 405 F.3d 1034 (4th Cir. 2005).

**[10]** Fourth, as discussed earlier, the D.C. Circuit ultimately held that the procedural due process violation it identified was harmless. When challenging the 1999 designation, the MEK admitted to numerous terrorist acts making an argument that amounted to a claim that the enemy of our enemy is our friend,[42] a decision that is committed to the Executive Branch, not the courts. Due to this "admission," the D.C. Circuit held that, even if there were a due process violation, the MEK was not harmed by it.

**[11]** Thus, defendants' new due process argument attacks a designation that withstood judicial review, that we have no authority to review, that defendants knew was in place throughout the period of the indictment, and that is supported by the MEK's own submission. Defendants suffered no deprivation of due process, and even if they had, it was harmless.

The defendants further attempt to distinguish *Lewis*, a Supreme Court decision adding that a prior conviction is an adequate predicate for a "felon in possession" charge even if the prior conviction was obtained unconstitutionally, by relying on *United States v. Mendoza-Lopez*.[43] In that case, the Supreme Court held that a prosecution under 8 U.S.C. § 1326 for illegal reentry does not comport with due process if there is no judicial review of whether the predicate deportation proceeding violated the alien's rights.[44] It is not at all clear from *Mendoza-Lopez* that the Supreme Court meant that the due process problem is in the *later* proceeding. The Court held that "where a determination made in an administrative pro-

---

[42]MEK "argues that the attempt to overthrow the despotic government of Iran, which itself remains on the State Department's list of state sponsors of terrorism, is not 'terrorist activity,' or if it is, that it does not threaten the security of the United States or its nationals." *People's Mojahedin Org. of Iran v. Dep't of State*, 327 F.3d 1238, 1244 (D.C. Cir. 2003).

[43]*United States v. Mendoza-Lopez*, 481 U.S. 828 (1987).

[44]*Id.* at 837-38.

ceeding is to play a critical role in the subsequent imposition of a criminal sanction, there must be *some* meaningful review of the administrative proceeding."**45** Nothing in *Mendoza-Lopez* appears to require that this review be had by the defendant in the subsequent criminal proceeding.

[12] Furthermore, it is obvious in *Lewis* and *Mendoza-Lopez* that the opportunity to seek review would be in the hands of the defendants themselves because it was *their* rights at issue in the hearing that created the predicate in the later criminal proceeding. But here, the defendants' rights were not directly violated in the earlier designation proceeding. The predicate designation was against the MEK, not the defendants. Section 1189 provides for the organizations to seek review of the predicate designation, and that review was had in this case. Therefore, due process does not require another review of the predicate by the court adjudicating the instant § 2339B criminal proceeding.

[13] Our holding is further supported by our decision in *United States v. Bozarov*.**46** In *Bozarov*, we held that a defendant charged with exporting items listed under the Export Administration Act without a license did not have a due process right to collaterally attack the listing in his criminal proceeding.**47** We held, however, that Bozarov had standing to challenge the constitutionality of the Export Act in his criminal proceeding.**48** This was because the Export Act explicitly provided that all actions taken by the Secretary of Commerce under it were "not subject to judicial review," including a denial of the license that was a predicate for a violation of the criminal provision.**49** If a defendant were not allowed to chal-

---

**45***Id.* (emphasis in original).

**46***United States v. Bozarov*, 974 F.2d 1037 (9th Cir. 1992).

**47***Id.* at 1045-46.

**48***Id.* at 1040-41.

**49***Id.* at 1039.

lenge the Export Act in that proceeding, there would be *no* arbiter of the constitutionality of the Export Act. In contrast, Congress has explicitly provided that the D.C. Circuit is the arbiter of the constitutionality of any designation under § 1189. Thus, there is no constitutional need for the defendants to challenge the predicate designation in this proceeding.

As we noted in another case where we rejected a defendant's right to challenge an export listing in a subsequent criminal proceeding, the defendants' argument here "is analogous to one by a defendant in a drug possession case that his conviction cannot stand because no specific showing has been made that the drug is a threat to society. . . . [A] showing that the drug possessed by the individual defendant has a 'detrimental effect on the general welfare' [is not] an element of the offense."[50] Likewise, the element of the crime that the prosecutor must prove in a § 2339B case is the predicate fact that a particular organization *was* designated at the time the material support was given, not whether the government made a correct designation. Our position is consistent with that of the Fourth Circuit, which held that a defendant's inability to challenge the designation was not a violation of his constitutional rights, since the *validity* of the designation is not an element of the crime.[51] Rather, the element is the *fact* of an organization's designation as a "foreign terrorist organization."[52]

III.   First Amendment claim.

The defendants argue that the MEK is not a terrorist organi-

---

[50]*United States v. Mandel*, 914 F.2d 1215 n.11 (9th Cir. 1990) (quoting *Spawr Optical Research, Inc. v. Baldridge*, 649 F. Supp. 1366, 1372 n.10 (D.D.C. 1986)).

[51]*United States v. Hammoud*, 381 F.3d 316, 331 (4th Cir. 2004) (en banc).

[52]*Id.*

zation, and that they have a right under the First Amendment to contribute money to it. The argument is: (1) they have a First Amendment right to contribute to organizations that are not terrorist; (2) the statutory scheme denies them the opportunity to challenge the "foreign terrorist organization" designation; so therefore (3) it deprives them of their First Amendment right to make contributions to non-terrorist organizations.

This argument is mistaken because what the defendants propose to do is not to engage in speech, but rather to provide material assistance. The statute says "knowingly provides material support or resources to a foreign terrorist organization."[53] The indictment charges them with sending money to the MEK.

The defendants argue that they seek to express their political views, not by supporting terrorism, but rather by supporting an organization that the State Department has mistakenly designated as terrorist.[54] The due process part of this argument, that they are entitled to an opportunity in their criminal proceeding to relitigate whether the MEK is terrorist, is addressed above. Defendants also make a distinct free speech argument, however, based on *McKinney v. Alabama*.[55]

*McKinney* holds that the First Amendment rights of a newsstand proprietor were violated by his conviction under a statute that prohibited him from selling an obscene magazine.[56] What is similar to this case is that the obscenity of the maga-

---

[53]18 U.S.C. § 2339B(a)(1).

[54]This is an odd argument since the MEK itself has admitted that it has attacked various Iranian government organizations, assassinated several Iranian officials, and targeted Iranian Supreme Leader Khamenei for assassination. *See People's Mojahedin Org. of Iran v. Dep't of State*, 327 F.3d 1238, 1243 (D.C. Cir. 2003).

[55]*McKinney v. Alabama*, 424 U.S. 669 (1976).

[56]*Id.* at 673.

zine in *McKinney* was adjudicated, not in the criminal defendant's proceeding, but in a previous in rem proceeding against the magazine to which the newsstand proprietor was not a party.[57] The Court held that a decision in another proceeding could not conclusively determine First Amendment rights to sell a magazine of persons who had no notice and opportunity to be heard in that proceeding.[58] By analogy, the defendants in this case argue that they should be entitled to litigate the terrorism designation of the MEK in their criminal case.

The argument fails, however, because the cases are not analogous. The magazine in *McKinney* was speech, the money sent to the MEK is not. Though contributions of money given to fund speech receive some First Amendment protection,[59] it does not follow that all contributions of money are entitled to protection as though they were speech.

**[14]** What is at issue here is not anything close to pure speech. It is, rather, material support to foreign organizations that the United States has deemed, through a process defined by federal statute and including judicial review by the D.C. Circuit, a threat to our national security. The fact that the support takes the form of money does not make the support the equivalent of speech. In this context, the donation of money could properly be viewed by the government as more like the donation of bombs and ammunition than speech.[60] The "foreign terrorist organization" designation means that the Executive Branch has determined — and the D.C. Circuit, in choosing not to set aside the designation, has concluded that the determination was properly made — that materially sup-

---

[57]*See id.*

[58]*Id.* at 674.

[59]*See McConnell v. Fed. Election Comm'n*, 540 U.S. 93 (2003); *Buckley v. Valeo*, 424 U.S. 1 (1976).

[60]*See Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1133 (9th Cir. 2000).

porting the organization is materially supporting actual violence.

Donations to designated foreign terrorist organizations are not akin to donations to domestic political parties or candidates. An organization cannot be designated unless it is foreign,[61] so domestic associations are immune from the scheme. And in this case, there is no room for a vagueness challenge on the ground that the defendants were merely contributing what might arguably be in the nature of speech.[62] The indictment charges them with sending money to the designated terrorist organization, not with providing instruction or advocacy.

We have already held that the strict scrutiny standard applicable to speech regulations does not apply to a prohibition against sending money to foreign terrorist organizations.[63] That a group engages in politics and has political goals does not imply that all support for it is speech, or that it promotes its political goals by means of speech. Guns and bombs are not speech. Sometimes money serves as a proxy for speech, and sometimes it buys goods and services that are not speech. The government "may certainly regulate contributions to organizations performing unlawful or harmful activities, even though such contributions may also express the donor's feelings about the recipient."[64] There is no First Amendment right "to facilitate terrorism by giving terrorists the weapons and explosives with which to carry out their grisly missions."[65]

**[15]** A less rigorous standard of review is applied to monetary contributions than to pure speech.[66] Even giving money to perfectly legitimate political expression within the United

---

[61]8 U.S.C. § 1189(a)(1)(A).

[62]*Cf. Humanitarian Law Project*, 205 F.3d at 1137.

[63]*Id.* at 1135.

[64]*Id.*

[65]*Id.* at 1133.

[66]*McConnell*, 540 U.S. at 137.

States can be, and is, restricted by Congress, and such restrictions are consistent with the Constitution.[67] *A fortiori*, contribution of money to foreign organizations that the United States has determined engage in terrorist activities can be restricted by Congress.[68] It would be anomalous indeed that Congress could restrict the contribution of money for television commercials that say why a candidate would be a good or bad choice for political office, yet could not prohibit contribution of money to a foreign group that the government determines engages in terrorist activities. Defendants are entitled under the First Amendment to publish articles arguing that the MEK is not really a terrorist organization, but they are not entitled to furnish bombs to the MEK, nor to furnish money to buy bombs and ammunition.

The deference due the Executive Branch in the area of national security reinforces our conclusion that furnishing material assistance to foreign terrorist organizations must be distinguished from the *McKinney* issue, furnishing obscene magazines.[69]

In *McConnell*, the Court found that "the prevention of corruption or its appearance constitutes a sufficiently important interest to justify political contribution limits."[70] The interest in protecting our country from foreign terrorist organizations is *a fortiori* "a sufficiently important interest." "[T]he federal

---

[67]*See id.*; *Buckley*, 424 U.S. at 20 ("[A] limitation upon the amount that any one person or group may contribute to a candidate or political committee entails only a marginal restriction upon the contributor's ability to engage in free communication.").

[68]*See Humanitarian Law Project*, 205 F.3d at 1133.

[69]*See Regan v. Wald*, 468 U.S. 222, 242 (1984) ("Matters relating 'to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.' ") (quoting *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952)); *Zemel v. Rusk*, 381 U.S. 1 (1965) (rejecting due process challenge to the Secretary of State's refusal to validate passports of United States citizens to travel to Cuba).

[70]*McConnell*, 540 U.S. at 143.

government clearly has the power to enact laws restricting the dealings of United States citizens with foreign entities."[71] "[W]e must allow the political branches wide latitude in selecting the means to bring about the desired goal" of "preventing the United States from being used as a base for terrorist fundraising."[72]

[16] Conceivably the MEK developed its practices at a time when the United States supported the previous regime in Iran, and maintained its position while harbored by the Saddam Hussein Ba'ath regime in Iraq. Maybe the MEK's position will change, or has changed, so that its interest in overturning the current regime in Iran coincides with the interests of the United States. Defendants could be right about the MEK. But that is not for us, or for a jury in defendants' case, to say. The sometimes subtle analysis of a foreign organization's political program to determine whether it is indeed a terrorist threat to the United States is particularly within the expertise of the State Department and the Executive Branch.[73] Juries could not make reliable determinations without extensive foreign policy education and the disclosure of classified materials. Nor is it appropriate for a jury in a criminal case to make foreign policy decisions for the United States. Leaving the determination of whether a group is a "foreign terrorist organization" to the Executive Branch, coupled with the procedural protections and judicial review afforded by the statute, is both a reasonable and a constitutional way to make such determinations. The Constitution does not forbid Congress from requiring individuals, whether they agree with the Executive Branch determination or not, to refrain from furnishing material assistance to designated terrorist organizations during the period of designation.

**REVERSED.**

---

[71]*Humanitarian Law Project*, 205 F.3d at 1135.

[72]*Id.* at 1136.

[73]*See Nat'l Council of Resistance of Iran*, 251 F.3d 192.